UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

J & M ADVERTISING, LLC,

       Plaintiff,                                          Hon. Ellen S. Carmody

v.                                                            Case No. 1:12-CV-564

THE LEAD COMPANY, INC.,

       Defendant.

_____/

## OPINION

        This matter is before the Court on Plaintiff J&M's Motion for Summary Judgment, (dkt. #93), and Defendant/Counter-Plaintiff TLC's Motion for Summary Judgment, (dkt. #88). On August 26, 2013, the parties consented to proceed in this Court for all further proceedings, including trial and an order of final judgment. 28 U.S.C. § 636(c)(1). By Order of Reference, the Honorable Janet T. Neff referred this case to the undersigned. (Dkt. #60). For the reasons articulated below, both motions for summary judgment are **denied**.

### BACKGROUND

        The parties in this matter, Plaintiff J&M Advertising (hereinafter J&M) and Defendant/Counter-Plaintiff The Lead Company (hereinafter TLC) compete in the insurance lead industry. An insurance lead, in this particular context, is defined as "referrals and any and all information provided with such referrals, including but not limited to, any personal and contact information." (Dkt. #89, Exhibit 3). In other words, an insurance lead consists of information

concerning an individual whom an insurance agent may be interested in contacting regarding insurance products and services.

As the parties describe it, the insurance lead industry consists of three distinct types of participants: (1) generators; (2) aggregators; and (3) end users. The generators "create" insurance leads by compiling personal and contact information concerning individuals whom the generator has identified as having expressed an interest in purchasing insurance products. Aggregators purchase leads from the generators for the purpose of reselling such to the end users who attempt to persuade the lead to purchase insurance products or services. The parties in this matter, during the time period in question, both operated as aggregators, albeit in slightly different capacities.

On April 29, 2011, J&M and TLC entered into an agreement (the Lead Agreement) pursuant to which J&M developed relationships with insurance lead generators whereas TLC developed relationships with end users. (Dkt. #89, Exhibit 3). J&M agreed to purchase insurance leads from certain lead generators and exclusively offer such for sale to TLC which then re-sold such to certain end-users. (Dkt. #89, Exhibit 3). Collectively, J&M and TLC functioned as aggregators facilitating the sale of insurance leads from generators to end-users.

Shortly after the execution of the Lead Agreement, the relationship between the parties began to deteriorate. TLC determined that it no longer wished to purchase leads from certain sources and communicated such to J&M. TLC alleges, however, that J&M, despite assurances to the contrary, nevertheless continued to sell leads from sources which TLC had communicated were unacceptable. TLC further alleges that J&M "mis-coded" certain leads (i.e., assigned them an incorrect JM code) resulting in TLC being charged improper amounts for the leads in question.

Unable to resolve their differences regarding these matter, the parties, on March 29, 2012, executed a Settlement Agreement and Release of Claims (hereinafter the Settlement Agreement) "to provide for an orderly termination of" the Lead Agreement. (Dkt. #90, Exhibit 8). The Settlement Agreement provided that the parties continue their relationship, pursuant to the terms outlined in the Lead Agreement, for a 45-day period. The Settlement Agreement also contained a provision by which J&M and TLC each released any claims of which it "has actual knowledge" as of March 29, 2012.

J&M initiated the present action on June 4, 2012, asserting several causes of action originating from alleged breaches of the Settlement Agreement. (Dkt. #1, 67). Specifically, J&M asserts three state law claims, a claim under the Uniform Commercial Code, and a claim for attorney fees. TLC responded by asserting various counterclaims arising from alleged breaches of the Lead Agreement and Settlement Agreement. (Dkt. #7, 70). Specifically, TLC asserts three state law claims as well as a claim for attorney fees. The parties have each now moved for summary judgment as to their various claims.

**SUMMARY JUDGMENT STANDARD**

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party moving for summary judgment can satisfy its burden by demonstrating "that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case." *Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005); *see also*, *Amini v. Oberlin College*, 440 F.3d 350, 357 (6th Cir. 2006) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). The fact that the evidence may be controlled or possessed by the moving party does not

change the non-moving party's burden "to show sufficient evidence from which a jury could reasonably find in her favor, again, so long as she has had a full opportunity to conduct discovery." *Minadeo*, 398 F.3d at 761 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986)).

Once the moving party demonstrates that "there is an absence of evidence to support the nonmoving party's case," the non-moving party "must identify specific facts that can be established by admissible evidence, which demonstrate a genuine issue for trial." *Amini*, 440 F.3d at 357 (citing *Anderson*, 477 U.S. at 247-48; *Celotex Corp. v. Catrett*, 477 U.S. at 324). While the Court must view the evidence in the light most favorable to the non-moving party, the party opposing the summary judgment motion "must do more than simply show that there is some metaphysical doubt as to the material facts." *Amini*, 440 F.3d at 357. The existence of a mere "scintilla of evidence" in support of the non-moving party's position is insufficient. *Daniels v. Woodside*, 396 F.3d 730, 734-35 (6th Cir. 2005) (quoting *Anderson*, 477 U.S. at 252). The non-moving party "may not rest upon [his] mere allegations," but must instead present "significant probative evidence" establishing that "there is a genuine issue for trial." *Pack v. Damon Corp.*, 434 F.3d 810, 813-14 (6th Cir. 2006) (citations omitted).

Moreover, the non-moving party cannot defeat a properly supported motion for summary judgment by "simply arguing that it relies solely or in part upon credibility determinations." *Fogerty v. MGM Group Holdings Corp., Inc.*, 379 F.3d 348, 353 (6th Cir. 2004). Rather, the non-moving party "must be able to point to some facts which may or will entitle him to judgment, or refute the proof of the moving party in some material portion, and. . .may not merely recite the incantation, 'Credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof." *Id.* at 353-54. In sum, summary judgment is appropriate "against a party who fails to make a showing sufficient to

establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Daniels*, 396 F.3d at 735.

While a moving party without the burden of proof need only show that the opponent cannot sustain his burden at trial, *see Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 787 (6th Cir. 2000); *Minadeo*, 398 F.3d at 761, a moving party with the burden of proof faces a "substantially higher hurdle." *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002); *Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001). "Where the moving party has the burden -- the plaintiff on a claim for relief or the defendant on an affirmative defense -- his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quoting W. SCHWARZER, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-88 (1984)). The Sixth Circuit has repeatedly emphasized that the party with the burden of proof "must show the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Arnett*, 281 F.3d at 561 (quoting 11 JAMES WILLIAM MOORE, ET AL., MOORE'S FEDERAL PRACTICE § 56.13[1], at 56-138 (3d ed. 2000); *Cockrel*, 270 F.2d at 1056 (same). Accordingly, summary judgment in favor of the party with the burden of persuasion "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

## ANALYSIS

**I.        Applicable Body of Law**

J&M is a limited liability company organized under Florida law with its principle place of business in Florida. (Dkt. #67). TLC is a corporation incorporated under Michigan law with its principle place of business in Michigan. (Dkt. #71). For diversity purposes a corporation is considered a citizen of its state of incorporation as well as the state in which its principle place of business is located. *See* 28 U.S.C. § 1332(c)(1). As there exists complete diversity of citizenship in this matter and the amount in controversy exceeds $75,000, the Court has subject matter over the present dispute. *See* 28 U.S.C. § 1332(a)(1). When presiding over a diversity action, federal courts must apply the substantive law of the state in which the court sits, including that state's choice of law rules. *See Mill's Pride, Inc. v. Continental Ins. Co.*, 300 F.3d 701, 704 (6th Cir. 2002).

In *Chrysler v. Skyline Industrial Services, Inc.*, 528 N.W.2d 698 (Mich. 1995), the Michigan Supreme Court addressed the issue of the choice of law rules applicable in contract disputes. While recognizing that the "predominant view in Michigan has been that a contract is to be construed according to the law of the place where the contract was entered into," the court noted that such a "rigid" approach was not always appropriate. *Id.* at 702-03. In this respect, the court indicated that sections 187 and 188 of the Second Restatement of Conflict of Laws, with its "emphasis on examining the relevant contacts and policies of the interested states, provide a sound basis for moving beyond formalism to an approach more in line with modern-day contracting realities." *Id.* at 703.

Accordingly, in the context of a contract dispute, Michigan choice of law rules require courts to examine the factors articulated in sections 187 and 188 the Second Restatement (and employed by the *Chrysler* court) so as to balance "the expectations of the parties to a contract with the interests

of the states involved." *Mill's Pride*, 300 F.3d at 705 (recognizing that the *Chrysler* decision is the controlling authority in Michigan on choice of law issues involving contract disputes); *see also*, *Talmer Bank & Trust v. Parikh*, - - - N.W.2d - - -, 2014 WL 714867 (Mich. Ct. App., Feb. 25, 2014) (same). Section 187 of the Second Restatement of Conflict of Laws addresses the validity of contractual choice of law provisions. Section 188 of the Second Restatement, on the other hand, applies when the parties have entered into an agreement which is silent with respect to the choice of law that is to govern disputes thereunder. *See Talmer Bank & Trust*, 2014 WL 714867.

Both the Lead Agreement and the Settlement Agreement contain provisions that such shall "be governed by and construed in accordance with" Michigan law. (Dkt. #89, Exhibit 3; Dkt. #90, Exhibit 8). Pursuant to Section 187 of the Second Restatement of Conflict of Laws, this choice of law provision is to be given effect absent exceptions or circumstances not presently applicable. Restatement (Second) of Conflict of Laws § 187 (1971); *see also*, *Buist v. Digital Message Systems Corp.*, 2002 WL 31957703 at *3 (Mich. Ct. App., Dec. 27, 2002). Accordingly, the Court will apply Michigan law in this matter.

**II.         J&M's Motion for Summary Judgment**

J&M asserts the following claims in its amended complaint: (1) complaint on an account; (2) breach of contract; (3) unjust enrichment; (4) attorneys' fees; and (5) violation of the UCC. (Dkt. #67). J&M moves for summary judgment as to all claims.

1.     Attorneys' Fees

Both the Lead Agreement and Settlement Agreement contain provisions authorizing the "prevailing party" to recover "reasonable attorneys' fees, costs and necessary disbursements" incurred in pursuit of legal action "to enforce the terms" of the agreement in question.  Because J&M is not a prevailing party at this juncture, its motion for summary judgment on the subject of attorneys' fees is denied.

2.     Uniform Commercial Code

J&M asserts that TLC failed to comply with Section 2 of the Uniform Commercial Code (UCC) concerning the sale of goods.  In this regard, J&M argues that the insurance leads that were the subject matter of the Lead Agreement and Settlement Agreement are properly characterized as "goods" under the Uniform Commercial Code.  TLC counters that the UCC is inapplicable because the contracts in question concern the provision of services rather than the sale of goods.  As discussed herein, the Court concludes that the subject contracts both concerned the provision of services and, therefore, fall outside the purview of the UCC.

Section 2 of the UCC, which Michigan has adopted, "governs the relationship between the parties involved in 'transactions in goods.'"  *See Drummond Island Yacht Haven Inc. v. South Florida Sod, Inc.*, 2014 WL 198974 at *10 (Mich. Ct. App., Jan. 16, 2014) (quoting Mich. Comp. Laws § 440.2102).  The UCC, however, does not apply to agreements for the provision of services.  *See Drummond Island*, 2014 WL 198974 at *10.  To determine whether a contract involves the sale of goods, which comes within the purview of the UCC, or the sale of services, beyond the reach of the UCC, Michigan courts apply the "predominant factor" test pursuant to which the court must determine

whether "the purchaser's ultimate goal" is to acquire a product or service. If the purchaser's ultimate goal is to acquire a product, the contract should be deemed a transaction in goods "even though service is incidentally required." On the other hand, if the purchaser's ultimate goal is to acquire a service, the contract falls outside the scope of the UCC "even though goods are incidentally required on the provision of this service." *Id.*

While resolution of this particular issue is "generally one of fact," where "there is no genuine issue of any material fact regarding the provision of the contract, a court may decide the issue as a matter of law." *J&B Sausage Co. v. Department of Management & Budget*, 2007 WL 28409 at *1 (Mich. Ct. App., Jan. 4, 2007). As the Court discerns no disputes of fact regarding the purpose of the subject contracts, the Court finds that it can resolve, as a matter of law, whether the UCC has any applicability in this matter. As discussed below, while the relationship between J&M and TLC arguably involved items which fit within the definition of a good,[1] the Court finds that the predominant component of the relationship concerned the provision of services.

In support of its position, J&M relies on *Big Farmer, Inc. v. Agridata Resources, Inc.*, 581 N.E.2d 783 (Ill. App. Ct. 1991), which concerned a breach of contract claim. Big Farmer was in the business of obtaining demographic information about individuals which it compiled into marketable mailing lists. *Id.* at 784. Agridata published Farm Futures magazine. Big Farmer sold to Agridata "mailing lists" of names of individuals "in a certain income group" which Agridata wanted to "solicit [as] potential subscribers." The contract dispute concerned the method by which to determine the amount Agridata owed Big Farmed for the mailing lists. *Id.*

---

[1] Under Michigan law, goods are defined as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities and things in action." Mich. Comp. Laws § 440.2105.

The *Big Farmer* court found that the contract in question came within the purview of the UCC because it was a contract for goods. *Id.* at 785. However, in reaching this conclusion the court did not apply the predominant factor test (or any similar test), but instead simply concluded that "since the information at issue is moveable and not otherwise precluded from the purview of [the] Uniform Commercial Code, the information may be considered goods as defined by [Illinois] statute." *Id.* The *Big Farmer* court appears to have simply presumed that if a contract concerned something which fit within the definition of a "good," the contract was governed by the UCC. As noted above, however, no such presumption applies under Michigan law. Instead, the Court must more closely examine the parties' relationship. Because the *Big Farmer* court applied a completely different legal standard, with respect to the applicability of the UCC, than that presently applicable, the Court finds this decision inapplicable and unpersuasive.[2]

The Court finds the authority cited by TLC, *Wall Street Network, Ltd. v. New York Times Company*, 80 Cal. Rptr.3d 6 (Cal. Ct. App. 2008), to be more relevant and persuasive on this particular question. In *Wall Street Network*, Click2Boost (C2B), an assignee of Wall Street Network (WSN), entered into an internet marketing agreement with the New York Times Company (NYT). *Id.* at 9. Pursuant to this agreement, C2B "was to solicit subscribers for home delivery of the New York Times newspaper by means of 'pop up ads' at Internet websites with which C2B maintained marketing alliances." If a person clicked on one of the subject pop up ads, and expressed an interest in subscribing to the New York Times, that information was provided to NYT. *Id.* A dispute subsequently arose regarding the accuracy of the information provided by C2B. *Id.* at 10.

---

[2] J&M also cites to *American Business Information, Inc. v. Classic Uniforms, Inc.*, 2002 WL 197936 (Tex. App. Ct., Feb. 6, 2002). This case, however, suffers from the same shortcoming as it relies on *Big Farmer* for the proposition that "[t]he sale of a mailing list constitutes a sale of goods." *Id.* at *1.

-10-

WSN asserted that the UCC governed because the information provided by C2B was properly characterized as goods. *Id.* at 18-19. In assessing whether the UCC applied, the *Wall Street Network* court applied a test which mirrors that applicable in Michigan:

> In determining whether the agreement was for the sale of goods or the provision of services, we must look to the essence of the agreement. When service predominates, the incidental sale of items of personal property does not alter the basic transaction.

*Id.* at 19.

Characterizing the agreement between C2B and NYT as a contract "for the transmission of data from an external source," the court concluded that the contract in question was for services rather than goods. *Id.* In so concluding, the court specifically distinguished the *Big Farmer* decision:

> Pointing to *Big Farmer*,. . .WSN contends that C2B provided goods to NYT because it identified potential subscribers to the New York Times, and was paid a fee for each potential subscriber. In Big Farmer, the publisher of a farming magazine bought a list of farmers within an income group from a business that sold demographic information and mailing lists, and used the list to solicit potential subscribers. The parties subsequently fell into a dispute about whether the purchase agreement obliged the publisher to pay a fee for each name on the list, or each new subscriber. The court concluded that the names and addresses sold constituted "goods" because they were "moveable." Here, C2B did not sell NYT names and addresses of persons to whom NYT intended - by its own efforts - to send solicitations for subscriptions; rather, C2B agreed to solicit subscribers for NYT by placing subscription advertisements for NYT in designated locations, and to forward responses to the advertisements. Whereas the provider in Big Farmer sold personal information it had compiled, C2B merely promised to transmit information from customers of C2B's marketing partners who choose to provide the information through the pop up ads. In our view, C2B thus agreed to provide a service for NYT. That NYT paid a fee for each submission does not establish that the submissions constituted "goods."

*Id.* at 19-20.

The Court finds that the present circumstance more closely resembles that described in *Wall Street Network* in that J&M did not obtain information on its own, but instead transmitted to TLC information, within certain parameters, gathered by others. In this respect, J&M offered a service, the ability to work with certain lead generators to procure certain information. Even if the information in question fits within the definition of a good, TLC's ultimate purpose here was to engage J&M to provide a service. This conclusion is further supported by the fact the Lead Agreement characterizes the agreement as one for the provision of services. (Dkt. #89, Exhibit 3 at 1). The Court concludes, therefore, that the UCC has no applicability in this matter. Accordingly, Plaintiff J&M's motion for summary judgment as to its UCC claims is denied.

        3.      Complaint on Account and Breach of Contract

These claims both concern TLC's actions following the execution of the Settlement Agreement. Specifically, J&M alleges that despite continuing to fulfill its contractual obligations following the execution of the Settlement Agreement, TLC refused to fully pay the amounts owing for such. These claims concern the amounts owing for March and April 2012. With respect to March, J&M alleges that it billed TLC $425,385.03 of which TLC paid $226,782.48 leaving an unpaid balance of $198,602.55. J&M further alleges that it billed TLC $136,908.52 for services performed in April, none of which was paid. Thus, J&M alleges that TLC has failed to pay $335,511.07 for services performed pursuant to the Settlement Agreement.

TLC does not dispute that it failed to pay the amounts in question, but asserts that it was not required to pay the amounts in question because J&M breached both the Lead Agreement and the Settlement Agreement by submitting invalid leads. TLC asserts that it rejected many of the leads

provided during the relevant time period because they were "from unauthorized, unaccepted and terminated sources." TLC asserts that it rejected other leads because they were "misclassified" (i.e., billed according to the incorrect JM code). J&M does not dispute that TLC rejected certain leads during the time period in question, but instead argues that TLC lacked any legitimate basis for rejecting the leads in question.

However, there exist factual disputes concerning both the methodology by which the JM codes were established as well as whether J&M submitted invalid leads. Accordingly, summary judgment as to these claims is not appropriate at this juncture as there remain unresolved factual disputes regarding whether there existed a legitimate basis for TLC to reject the leads in question.

4. Unjust Enrichment

As discussed above, TLC rejected (and refused to pay for) many leads provided by J&M following the execution of the settlement agreement. TLC did not return these rejected leads to J&M, however, but instead sold them to end users. J&M asserts that permitting TLC to reject a lead, thereby evading payment, only to sell such to an end user constitutes unjust enrichment.

To prevail on a claim of unjust enrichment, J&M must establish "the receipt of a benefit" by TLC which is "inequitable [for TLC to] retain." *Affinity Resources, Inc. v. Chrysler Group, LLC*, 2013 WL 5576111 at *8 (Mich. Ct. App., Oct. 10, 2013). The "key consideration" is whether TLC's "retention of the benefit would be unjust as between the parties." The test to determine whether the retention of a benefit is unjust as between two parties "depends on a reasonable person standard: whether 'reasonable men in like situation as those who received and are benefited. . .naturally would and ought to understand and expect compensation was to be paid." *Id.*

TLC responds, however, that under Michigan law, if one party breaches a contract it cannot later bring an action against the other party for a subsequent breach. (Dkt. #89 at 20). TLC argues that pursuant to this authority, J&M has forfeited its breach of contract claims because such arose subsequent to the conduct giving rise to TLC's breach of contract claims. The general rule under Michigan law is that "the party committing the first *substantial* breach of contract cannot maintain an action against a party for failure to perform." *Hospitalists of Northwest Michigan, P.L.C. v. Fischer*, 2013 WL 5576096 at *7 (Mich. Ct. App., Oct. 20, 2013) (emphasis added). However, there exist factual disputes concerning whether J&M committed breach of contract and, moreover, whether any such breach is sufficiently substantial to invoke this rule. Accordingly, summary judgment as to this particular claim is not appropriate at this juncture.

## II.        TLC's Motion for Summary Judgment

TLC asserts the following claims in its amended counter-complaint: (1) breach of contract; (2) unjust enrichment; (3) fraudulent misrepresentation; and (4) attorney fees. (Dkt. #70). TLC moves for summary judgment as to all claims.

### 1.        Attorneys' Fees

Both the Lead Agreement and Settlement Agreement contain provisions authorizing the "prevailing party" to recover "reasonable attorneys' fees, costs and necessary disbursements" incurred in pursuit of legal action "to enforce the terms" of the agreement in question. Because TLC is not, at this juncture, a prevailing party, its motion for summary judgment on the subject of attorneys' fees is denied.

      2.      Breach of Contract

TLC alleges that J&M breached the Lead Agreement and the Settlement Agreement through the following actions: (1) failing to provide valid leads; (2) failing to properly differentiate the source of the leads submitted by using incorrect JM/campaign codes; (3) offering and/or selling leads to third parties which were not first offered to TLC; (4) offering and/or selling leads to third parties which had already been sold to TLC.

      A.      Failing to Provide Valid Leads

The Lead Agreement provides that TLC will pay J&M for "valid Leads" pursuant to the pay structure incorporated into the Lead Agreement as Exhibit A. (Dkt. #89, Exhibit 3 at ¶ 6). The contract defines a lead as "valid" only if it satisfies eleven distinct criteria, one of which is that the lead "is not rejected by" TLC which "may reject a Lead at any time for any reason or no reason at all." (Dkt. #89, Exhibit 3 at ¶ 4). The contract further provides that "Leads which are not valid. . .may NOT be replaced, and any payment made will immediately be refunded." (Dkt. #89, Exhibit 3 at ¶ 5). Moreover, TLC "may, at its option, cancel, rescind or otherwise nullify [the contract] if [J&M] fails to comply with" this particular provision. (Dkt. #89, Exhibit 3 at ¶ 5).

On December 21, 2011, David McFarland, CEO of TLC, sent to Lowell Bloodworth, an official with J&M, an email directing J&M to "make sure we (TLC) are not receiving indirectly from any of the companies/people" listed in the email, to which Bloodworth responded, "will do." (Dkt. #117, Exhibit 9). One of the companies identified in this email was Adaroo. (Dkt. #117, Exhibit 9). Bloodworth acknowledged receipt of this email during his deposition. (Dkt. #89, Exhibit 4 at 248). There exists, however, a factual dispute as to the meaning of Bloodworth's statement, "will do."

Bloodworth testified that when he said, "will do," he really meant that he would simply contact Adaroo to "make sure that [its] sources and [its] suppliers are sending good lead traffic." (Dkt. #89, Exhibit 4 at 265-66). TLC, on the other hand, interpreted Bloodworth's comment as signaling that J&M would discontinue forwarding to TLC leads from Adaroo. This factual dispute is sufficient to preclude summary judgment as to this claim. TLC has also failed to demonstrate the absence of a factual dispute regarding its allegation that J&M, subsequent to December 20, 2011, continued to forward Adaroo-generated leads, but disguised this by assigning different JM codes (or campaign codes) to such leads. Thus, TLC's motion for summary judgment is denied as to this particular claim.

B.  Failing to Properly Differentiate the Source of Certain Leads

The Lead Agreement provides that TLC shall pay J&M "for valid Leads, based on the price indicated in Exhibit A, within thirty (30) days of billing date." (Dkt. #89, Exhibit 3 at ¶ 6). Exhibit A to the Lead Agreement provides that J&M agrees to sell to TLC "exclusive insurance sales Leads" at the rates detailed therein. (Dkt. #89, Exhibit 3 at Exhibit A). The price of a particular lead is a function of three variables: (1) the state in which the lead resides; (2) the time of day that the lead was generated; and (3) the source of the lead (i.e., the method by which the lead was generated and/or the identity of the generator). On Exhibit A to the Lead Agreement, the source of the lead is identified by reference to an alpha-numeric code (the JM number) developed by the parties. The leads generated by different generators and/or through different generation methods were to be assigned a different JM number (also referred to by the parties as a "campaign code"). This system was necessary because the quality and, therefore, value of leads differed due to the source, location, and method utilized to obtain

such. The parties have failed, however, to present evidence concerning the methodology by which these JM/campaign codes were calculated and/or assigned.

In addition to alleging that J&M breached the contract by continuing to forward leads generated by "rejected" sources, TLC asserts that J&M breached the contract by incorrectly identifying the source of these invalid leads. TLC alleges that J&M knowingly assigned the leads from rejected sources to incorrect JM/campaign codes in an effort to disguise the fact that it was continuing to supply TLC with leads generated from rejected sources. However, because there exist factual disputes concerning the methodology by which the JM/campaign codes were calculated and/or assigned and, by extension, whether J&M's actions in this regard violate the contracts in question, summary judgment as to this claim is not appropriate at this juncture.

    C.  Offering/Selling Leads to Third Parties without First Offering such to TLC

In its motion for summary judgment, TLC does not address this particular breach of contract theory. Having failed to demonstrate the absence of a genuine factual dispute regarding such, TLC's motion for summary judgment is denied as to this particular theory.

    D.  Offering/Selling Leads which had Already been Sold to TLC

In its motion for summary judgment, TLC does not address this particular breach of contract theory. Having failed to demonstrate the absence of a genuine factual dispute regarding such, TLC's motion for summary judgment is denied as to this particular theory.

### 3. Unjust Enrichment and Fraudulent Misrepresentation

TLC alleges that beginning no later than December 2011, J&M misrepresented that the leads it provided to TLC were valid as defined by the Lead Agreement. Based on these misrepresentations, TLC paid J&M according to the terms of their agreement. According to TLC, however, these leads (or at least a certain number thereof) were invalid. TLC asserts that J&M engaged in fraudulent misrepresentation and, furthermore, that it constitutes unjust enrichment for J&M to retain payment for such invalid leads.

#### a. Unjust Enrichment

In its amended counter-complaint, TLC alleges that "[i]t would be inequitable for J&M to retain the compensation paid to it by TLC when it has failed to provide valid leads." TLC further asserts that "[a]s a result, J&M has been unjustly enriched and should be required to reimburse TLC for the payments made." As discussed herein, there exist factual disputes as to whether J&M supplied TLC with invalid leads. Accordingly, summary judgment as to this claim is not appropriate at this juncture.

#### b. Fraudulent Misrepresentation

In its amended counter-complaint, TLC alleges that J&M "misrepresented to TLC that it was providing valid leads to TLC." TLC alleges that J&M made these representations with knowledge of their falsity and with the intent that TLC rely on such. TLC alleges that it "did in fact rely on the misrepresentations to its detriment." In its motion for summary judgment, TLC alleges that J&M misrepresented the "source and quality" of the leads it provided.

To prevail on this claim, TLC must establish the following elements: (1) J&M made a material representation; (2) the representation was false; (3) J&M knew the statement was false or made it recklessly without regard for its truth; (4) J&M intended for TLC to rely on the representation; (5) TLC did rely on the representation; and (6) TLC suffered damages. *See Vandenbrink v. Miller*, 2013 WL 1776428 at *3 (Mich. Ct. App., Apr. 25, 2013). An action for fraudulent misrepresentation "must be predicated upon a statement relating to a past or an existing fact." *T & K Fiberglass, Inc. v. Avalon & Tahoe, Inc.*, 2007 WL 101769 at *4 (Mich. Ct. App., Jan. 16, 2007). Future promises "are contractual and do not constitute fraud." *Id.* An exception to this latter rule exists, however, if a promise is made in bad faith without the intention, at the time the promise is made, to perform the promise. *Id.* Furthermore, a plaintiff's reliance on the alleged false statement must have been reasonable. *Id.*

TLC alleges that J&M made the following false representations: (1) J&M represented that it would discontinue sending leads from Adaroo, but nevertheless continued to do so; (2) J&M misrepresented the JM/campaign codes applicable to certain leads so as to "affect the price it received;" and (3) J&M "misrepresented the source of leads and sold leads to TLC from suppliers which had not been authorized and for which no price had been negotiated."

As previously discussed, there exists a factual dispute as to whether J&M represented that it would discontinue selling to TLC leads generated by Adaroo. Likewise, as noted above, there exist factual disputes regarding the methodology by which the JM/campaign codes were to be calculated and/or assigned. Finally, TLC has failed to demonstrate the absence of a factual dispute concerning whether J&M misrepresented the source of any of the leads in dispute. Accordingly, TLC's motion for summary judgment is denied as to this claim.

**CONCLUSION**

For the reasons articulated herein, Plaintiff J&M's Motion for Summary Judgment, (dkt. #93), and Defendant/Counter-Plaintiff TLC's Motion for Summary Judgment, (dkt. #88), are both **denied**. An Order consistent with this Opinion will enter.

Date:  May 29, 2014                              /s/ Ellen S. Carmody
                                                ELLEN S. CARMODY
                                                United States Magistrate Judge